















CGL   4/30/04   8:41

3:02-CV-02108   CRENSHAW V. MONY LIFE INSURANCE

*184*

*OBJ.*



1 GORDON CHURCHILL Bar No. 42603
  RAUL CADENA Bar No. 185787
2 **CADENA CHURCHILL, LLP**
  1202 Kettner Blvd., Suite 4100
3 San Diego, California 92101
  Telephone: (619) 234-3776
4 Facsimile: (619) 234-3641

5 Attorneys for Plaintiff ROGER T. CRENSHAW

6

7

8                   **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 ROGER T. CRENSHAW,                    ) CASE NO. 02-CV-2108-LAB(RBB)
                                         )
12         Plaintiff,                    )
                                         ) **OBJECTIONS OF PLAINTIFF TO**
13 v.                                    ) **DISCOVERY ORDER OF**
                                         ) **MAGISTRATE JUDGE**
14 MONY LIFE INSURANCE COMPANY;          ) **[Fed. R. Civ. P. 72(a)]**
   DISABILITY MANAGEMENT SERVICES,       )
15 INC.,                                 ) (Courtroom of District Court Judge
                                         ) Larry A. Burns)
16         Defendants.                   )
                                         )
17 _____ )
                                         )
18 MONY LIFE INSURANCE COMPANY,          )
                                         )
19         Counter-Plaintiff,            )
                                         )
20 v.                                    )
                                         )
21 ROGER T. CRENSHAW,                    )
                                         )
22         Counter-Defendant.            )
   _____ )

23

24        Plaintiff Roger T. Crenshaw hereby objects, pursuant to Rule 72(a) of the Federal Rules of

25 Civil Procedure, to the Opinion and Order signed by the Court on April 16, 2004, and served on the

26 parties on April 21, 2004 (a copy of said order is attached as **Exhibit 1**) on the grounds that the

27 order, issued by the Hon. Ruben B. Brooks, Magistrate Judge, is clearly erroneous and/or contrary to

28 law.

                                                            **02cv2108-LAB(RBB)**

# I.

## INTRODUCTION

On October 25, 2002, Plaintiff Roger T. Crenshaw filed his complaint against MONY Life Insurance Company. Plaintiff generally alleges that he was the policyholder of a disability insurance policy issued by defendant 25 years earlier. Plaintiff, a 60-year-old physician, suffered a disabling condition in October of 1998, and made a claim for the $2,750.00 per month in benefits. Defendant accepted the claim and paid the claim through September of 2002, at which time the claim was denied. In addition to the denial, Defendant MONY claimed that the four years of benefits paid was paid erroneously, and demanded approximately $137,000.00 from Plaintiff. Plaintiff alleged, *inter alia*, that the denial was improper, the demand for reimbursement was improper, and asked for declaratory relief and damages caused by tortious conduct, including bad faith, as well as punitive damages.

Defendant counterclaimed for declaratory relief, breach of contract and fraud, seeking the $137,000.00 in benefits and also alleging punitive damages.

# II.

## OBJECTIONS

(1) The Magistrate Judge erroneously and contrary to law concluded that MONY's counsel's violation of HIPAA, which was admitted to by MONY's counsel, was cured by the Magistrate's sanction which requires MONY produce Dr. Jeffrey Harris for deposition at MONY's expense;

(2) The Magistrate Judge erroneously and contrary to law concluded that Defendant's counsel did not violate ethical rules;

(3) The Magistrate Judge erroneously concluded that Defendant's counsel's violation of HIPAA was inadvertent.

(4) The Magistrate Judge erroneously and contrary to law concluded that Dr. Jeffrey Harris is not Plaintiff's treating physician;

(5) The Magistrate Judge erroneously concluded that Defendant's counsel's misconduct is not likely to have a substantial continuing effect on future judicial proceedings.

## III.

## PROCEDURAL BACKGROUND

The Case Management Order issued in this case required MONY to designate its experts by October 22, 2003. On or about October 21, 2003, MONY requested a six-day extension after it represented to the Court that its experts had not finalized their reports. [1] *See* **Exhibit C**, attached to Churchill Decl. On or about October 28, 2003, MONY served on Dr. Crenshaw its expert witness designation. MONY designated as its expert witness Dr. Jeffrey Harris, one of Dr. Crenshaw's treating physicians, to testify on the "validity of Dr. Crenshaw's disability claim." *See* **Exhibit B**, attached to Churchill Decl. MONY designated Dr. William Slattery to testify on the exact same subject matter. *See* **Exhibit D**, attached to Churchill Decl. MONY characterizes Dr. Slattery as a "back-up" expert witness in the event Dr. Harris is not available to testify. *See* MONY's Supplemental Brief in Opposition, p. 9, lines 15-19.

MONY's counsel never contacted Dr. Crenshaw's counsel to advise of the *ex parte* communication with Dr. Harris. *See* Churchill Decl. ¶ 4. Nor did Dr. Harris ever contact Dr. Crenshaw or his counsel, before, during or after the *ex parte* communication with MONY's counsel. *See* Churchill Decl, ¶ 4 and Declaration of Roger Crenshaw in Support of Plaintiff's Motion to Disqualify ("Crenshaw Decl.") ¶ 7.

Dr. Crenshaw's counsel inquired of MONY's counsel the nature of the communication with Dr. Harris. *See* Churchill Decl. ¶ 5 . MONY's counsel refused to respond to Dr. Crenshaw's counsel's inquiries. *See* Churchill Decl. ¶ 5. Dr. Crenshaw's counsel, upon securing a medical authorization, contacted Dr. Harris' secretary for an appointment to meet with Dr. Harris. *See* Churchill Decl. ¶ 6. Dr. Harris refused to meet with Dr. Crenshaw's counsel and MONY's counsel, refusing to elaborate on the nature of the communication, told Dr. Crenshaw's counsel to "take Dr. Harris' deposition" to learn the nature of the communication. MONY's counsel informed Dr. Crenshaw's counsel that they were not to contact Dr. Harris. *See* **Exhibit E**, attached to Churchill

---

[1] In fact, Dr. Harris' report indicates that he signed it on October 20, 2003. *See* **Exhibit B**, attached to Declaration of Gordon Churchill in Support of Plaintiff's Motion to Disqualify ("Churchill Decl.").

1  Decl. and ¶ 6. After Dr. Crenshaw's counsel consulted with MONY's counsel, Dr. Harris'

2  deposition was scheduled for November 19, 2003. Dr. Crenshaw issued a subpoena for Dr. Harris'

3  appearance which he ignored. *See* **Exhibit F**, attached to Churchill Decl. and ¶ 7 and **Exhibit I**,

4  attached to Declaration of Gordon Churchill in Support of Plaintiff's Supplemental Brief ("Churchill

5  Supp. Decl.") and ¶ 15. One week before Dr. Harris' deposition, MONY's counsel informed Dr.

6  Crenshaw's counsel that Dr. Harris would not be appearing for his deposition on November 19,

7  2003, and that he would not be available for his deposition before the discovery cut-off date of

8  November 24, 2003. *See* Churchill Decl. ¶ 7.    Dr. Harris refused to appear for the November 19,

9  2003, deposition. *See* Churchill Decl. ¶ 8.  Despite numerous efforts to accommodate Dr. Harris,

10  including agreeing to depose him for no longer than 30 minutes at whatever hour of the weekday or

11  weekend was convenient, Dr. Harris did not make himself available for deposition before the

12  discovery cut-off date of November 24, 2003, and MONY's counsel refused to discuss the nature of

13  their *ex parte* communication. *See* Churchill Decl. ¶ 8.

14      Plaintiff filed and served his Motion to 1) Disqualify Peter Mason and Todd Sorrell as

15  Defendant's Attorneys and 2) Disqualify or Strike Jeffrey Harris as Defendant's Expert Witness on

16  November 26, 2003. The Court continued the hearing date on the motion from February 17, 2003, to

17  March 22, 2004. At the hearing on March 22, 2004, the Court requested supplemental briefing on

18  discreet issues and continued the hearing date to April 12, 2004. A copy of the transcript of the April

19  12, 2004, hearing is attached hereto as **Exhibit 2**. Plaintiff now timely files his Objections to the

20  order of the Magistrate Judge pursuant to rule 72(a) of the Federal Rules of Civil Procedure.

21  IV.

22  <u>**THE MAGISTRATE'S ORDER WAS CLEARLY ERRONEOUS AND/OR CONTRARY TO**</u>

23  <u>**LAW**</u>

24      A.    **Mony's Counsel's Violation of HIPAA Is Not "Cured" By The Sanction Ordered**

25  **By The Magistrate Judge - Ordering The Deposition Of The Violating Doctor To**
   **Be Paid For By The Violating Defense Attorney.**

26      There can be no doubt that any uncertainty about contacting an adversary's physician without

27  notice, ethical, legal or otherwise, was put to rest for all time when Congress enacted HIPAA. This

28  law became effective in April of 2003, well before the conduct in question. It clearly requires

defense counsel and the physician to give notice to the patient, in this case, Plaintiff. However,

neither MONY's counsel nor Dr. Harris provided any such notice. In Todd Sorrell's supplemental

declaration in support of MONY's supplemental brief in opposition, he effectively admits to a

violation of HIPAA and makes no effort to claim that the HIPAA violation was inadvertent. [2]  In

addition, plaintiff provided the court with a declaration from Daniel White, a prominent insurance

defense attorney in San Diego, opining that the conduct of MONY's counsel was unethical and

below the standards of practice. MONY did not provide the court with any contrary declaration.

At the final hearing wherein the Magistrate ordered the sanction, Peter Mason, counsel for

MONY, conceded that ever since its enactment, he has been knowledgeable of the HIPAA

requirements. The sanction ordered by the Magistrate Judge, a deposition, was not sought by

plaintiff nor will a deposition after the damage has been done "undo" the harm.  The only way to

cure the harm is for the Court to disqualify Dr. Harris  from further involvement in this case.

Although plaintiff did note in his moving papers that Dr. Harris ignored a lawful subpoena and that

he refused to appear for even a 30 minute deposition before discovery cutoff, at no time did plaintiff

suggest a belated deposition.  The purpose of the deposition in November of 2003, was to learn

about the nature of the *ex parte* communication.  MONY refused to disclose the *ex parte* conduct

other than through a deposition.    It appears that the Magistrate Judge, in ordering the sanction

which MONY recommended, a deposition of Dr. Harris paid for by MONY, focused on Dr. Harris'

disregard of a valid deposition subpoena instead of the harm caused to Plaintiff and the loss of

Plaintiff's constitutional right to a fair trial. Plaintiff is now aware of the facts of the misconduct. A

deposition at this point is virtually worthless to Plaintiff. Over $30,000.00 in needless expense has

been incurred by Plaintiff because of the nefarious and illegal conduct of MONY's counsel.

Allowing Dr. Harris to remain in this case as an expert, after MONY's counsel poisoned him through

an illegal *ex parte* contact is simply an injustice.

Setting aside the over $30,000.00 in needless expense caused by MONY's counsel's

---

[2] Needless to say, whether a violation of law is inadvertent or not is not the issue. The issue is the damage caused by the illegal conduct.  The only appropriate sanction is disqualification.

1   misconduct, the Court must also consider the other harm done by MONY's counsel's actions in

2   determining the appropriateness of the sanction. Dr. Crenshaw has approximately $200,000.00 in

3   future policy benefits at stake, as well as the $137,000.00 in past benefits MONY paid to Dr.

4   Crenshaw in the four years prior to the denial of his claim which MONY claims are now due. Dr.

5   Crenshaw has incurred over $400,000.00 in attorney fees which he seeks from MONY. Allowing

6   Dr. Harris to remain in the case as an expert and to assist MONY in its nefarious effort to use

7   (misuse) Dr. Harris as its expert, is a delightful trade-off for MONY. MONY will gladly pay

8   $2,000.00 in deposition expenses in exchange for the opportunity to taint and use Dr. Harris to help

9   defeat Plaintiff's claim of approximately one million dollars. [3]

10          If this Court allows Dr. Harris to remain in the case, this Court is rewarding counsel's

11   unethical conduct and violation of an Act of Congress and in effect encouraging counsel to in the

12   future overlook both ethical and HIPAA notice requirements, either of which would have prevented

13   the harm to Plaintiff and the concomitant loss of his right to a fair trial.

14   **B.    MONY's counsel violated ethical rules**

15          MONY's counsel was obligated to contact Plaintiff's counsel before engaging in the *ex parte*

16   contact with Dr. Harris. MONY's counsel's failure to do so was in violation of ethical rules.

17   / / /

18   / / /

19   / / /

20   / / /

21

22   _____

23          [3]   As noted in Plaintiff's moving papers, Dr. Harris is a redundant witness as
     MONY has another expert physician listed to testify regarding Plaintiff's inability to

24   return to his professional duties. It is important to note that neither doctor opines as to
     the hearing loss which, separate and apart from the tinnitus, is a cause of Plaintiff's

25   inability to do psychotherapy. The "serious doubts" to which Dr. Harris refers
     regarding the extent of Plaintiff's tinnitus (only) is for the purpose of interjecting the

26   scandalous matter that Judge Miller earlier struck from the pleadings, then allowed
     "only as to the legal disability issue." "Legal disability" has been abandoned by

27   MONY, yet it has continued to use every device to keep the scandalous matter in the
     case, including the illegal and unethical conduct referred to in this motion.

28

1       In addition, California Rule of Professional Conduct 3-210 provides as follows: (in pertinent

2  part)

3            **A member shall not advise the violation of any law, rule or ruling**

4            **of a tribunal unless the member believes in good faith that such**

5            **law, rule, or ruling is invalid....**

6       The Magistrate found that MONY's counsel violated HIPAA. The ethical rules are in

7  complete accord with HIPAA, which preempted the cases cited by MONY in its opposition to

8  Plaintiff's motion to disqualify. Dr. Harris divulged privileged information to MONY's counsel at

9  their request and he thereby also violated HIPAA. Accordingly, because MONY's counsel advised

10  the violation of federal law, MONY's counsel clearly violated California Rule of Professional

11  Conduct 3-210.

12     **C.**     **MONY's counsel's violation of HIPAA Was Not Inadvertent**

13       As early as March 13, 2003, MONY's counsel was aware that Dr. Harris had knowledge of

14  Dr. Crenshaw's condition and ability to work. *See* **Exhibit A** in support of Supplemental Brief in

15  opposition to Motion to Disqualify. By MONY's counsel's own admission, "sometime between

16  October 10, 2003, and October 16, 2003", MONY's counsel again became aware that Dr. Harris had

17  met with Dr. Crenshaw to treat his tinnitus. *See* Supplemental Declaration of Todd Sorrell, ¶ 8.

18  Rather than immediately notify Plaintiff's counsel and this Court of the improper *ex parte* contact,

19  MONY's counsel, in bad faith, violated Plaintiff's physician-patient privileged, provided Dr. Harris

20  with selective, misleading, scandalous and irrelevant information regarding Dr. Crenshaw and

21  forever tainted Dr. Harris as a percipient witness. MONY's bad faith is evident in that nothing in Dr.

22  Harris' report relates to whether Dr. Crenshaw can engage in his occupation as a psychiatrist/sex

23  therapist, a pivotal question in this case. To the contrary, Dr. Harris' report is replete with

24  speculation as to Dr. Crenshaw's motivations. MONY's counsel requested an extension of time

25  from the Court in which to file MONY's expert report to not only complete the nefarious activities

26  but to also poison MONY's "back-up" expert, Dr. Slattery. Not only did MONY's counsel fail to

27  offer evidence to support a claim of inadvertence but the attorney involved in the *ex parte*

28  communications failed to attend the April 12, 2004, hearing and MONY interfered with a properly

served subpoena requesting documents from Dr. Harris which would support a claim of inadvertence.

**D.    Dr Jeffrey Harris Is A Treating Physician**

In California, plaintiff's treating physician cannot be contacted by defense counsel without prior notice:

> **[A] communication by defense counsel with plaintiff's treating physician, without prior consent of plaintiff's counsel, regarding information in respect to which the physician/patient privilege has been waived, does not constitute a violation of a rule;** *however, because of the possibility of eliciting information not within the waiver, defense counsel's ethical duty requires that prior notice be given to plaintiff's counsel.*

Cal. Bar Association Comm. on Legal Ethics Op. 1975-33 (emphasis added) (Although there have been minor changes in the language of the rules, no substantive change has been made to the relevant rules since 1975. Therefore, the opinion is valid here.); *see* San Diego Bar Association Comm. on Legal Ethics Op. 1983-9; *see also* Cal. Evid. Code §§ 992-996; ABA EC 7-38; and ABA Cannon 7 (1983). The Committee's rationale for the conclusion is as follows:

> **(3) Because of the danger of invading the improper areas, however, it is our opinion that the defense counsel should notify the plaintiff or plaintiff's counsel in all cases before communicating with plaintiff's treating physician for the following reasons:**
>
> **(a) The privilege is sufficiently important to require the highest standard and conduct in order to prevent unwitting violation.**
>
> **(b) The defense counsel and the plaintiff's physician are not the proper persons to determine the existence of waiver. The best safeguard is notice to or participation of the patient, who is the holder of the privilege, or plaintiff's counsel.**

        **(c) Because of the importance of the privilege's protection, the**

**burden of advance notice is not unduly onerous.**

        **(d) If the advance notice meets with refusal of the physician to**

**discuss even the waived material, discovery procedures permit a**

**method of obtaining the information in a context that provides**

**notice to both the patient and the patient's counsel.**

Cal. Bar Association Comm. on Legal Ethics Op. 1975-33, p. 3-4.

Here, the undisputed facts are as follow:

1) Dr. Crenshaw went to Dr. Bone and Harris for treatment of his tinnitus and hearing

problems. Crenshaw Decl. ¶ 4

2) Dr. Crenshaw communicated confidential and personal information to Harris about his

physical and emotional condition as well as his general health. Crenshaw Decl. ¶ 4.

3) At no time did Harris dissuade Dr. Crenshaw from disclosing confidential or personal

information or from speaking freely. Id.

4) Harris examined and tested Dr. Crenshaw in an effort to look for treatable causes to his

problems. Declaration of Jeffrey Harris in opposition to Motion to Disqualify ("Harris

Decl.") ¶ 4.

5) Dr. Bones and Harris see and treat patients at Scripps Clinic. Id.

6) The information and opinions Harris possesses about Dr. Crenshaw were obtained by

virtue of his role as one of Dr. Crenshaw's treating physician. MONY's Exhibit E in

opposition to Motion to Disqualify, p. 47, ¶ 4.

7) Harris is a percipient witness. Harris Decl. ¶ 4; MONY's Exhibit E, p. 47, ¶ 4.

The Magistrate's reliance on cases defining the term "treating physician" to conclude Dr.

Harris is not a treating physician under the ethical rules is misplaced because those cases all focus on

worker injuries and disability determinations under the Social Security Act in particular and worker

injury and disability statutes in general and because HIPAA has preempted all case decisions on the

subject of patient privacy. HIPAA makes no distinction between "treating physician" and others

possessing medical information on a patient. The crux of the ethics opinions cited above is that prior

1   to engaging in *ex parte* communications, defense counsel must provide notice because the physician-

2   patient privilege is sufficiently important to require **the highest standard and conduct in order to**

3   **prevent unwitting violation.** *see Roberts v. Superior Court* (1973) 9 Cal.3d 330 (only patient can

4   waive the privilege and physician has the duty to assert the privilege on his behalf when disclosure is

5   sought); *Rudnik v. Superior Court* (1974) 11 Cal.3d 924. It does not follow from the ethics opinions

6   cited that the physician-patient privilege is to be selectively applied based upon a vague and

7   ambiguous criteria focusing on the extent of the relationship between the patient and his physician.

8   The undisputed facts enumerated above support the existence of a physician-patient privilege.

9       Dr. Harris is one of Plaintiff's physicians and MONY's counsel was obligated by HIPAA and

10  ethical rules to contact Plaintiff's counsel before engaging in the *ex parte* contact with Dr. Harris.

11  *See* Declaration of Dan White in Support of Motion to Disqualify. Accordingly, MONY's counsel

12  violated ethical rules.

### E.    MONY's counsel's Misconduct Will Have A Substantial Continuing Effect On Future Judicial Proceedings

15      The relevance of Harris' untainted assessment is that it is in no way contrary to Dr.

16  Crenshaw's claim that he is unable to perform the substantial and material duties of his occupation

17  as a therapist. To the extent that the Court considers Harris' expert report and declaration, in

18  opposition to Plaintiff's motions for summary judgment sufficient, which it should not, to

19  successfully oppose Dr. Crenshaw's pending motions for summary judgment, Dr. Crenshaw will be

20  forced to incur further costs to proceed to trial in this matter. Not only will MONY's counsel's

21  misconduct in having essentially tampered with a witness have a substantial continuing effect on

22  future judicial proceedings but it is in derogation of the search for truth. MONY's counsel violated

23  both the California and United States Constitutions which recognize the right to privacy

24  encompassed in HIPAA.

25      Because the paramount concern must be to preserve public trust in the scrupulous

26  administration of justice and the integrity of the bar and because the important right to counsel of

27  one's choice must yield to ethical considerations that affect the fundamental principles of our judicial

28  process, MONY's counsel should be disqualified and Dr. Harris should be disqualified or stricken as

1  an expert in this case. *See* <u>Rico v. Mitsubishi Motors</u>, 116 Cal. App. 4th 51 (2004) [4] In response to

2  the Magistrate's inquiry of what would be an appropriate sanction upon a finding that MONY's

3  counsel ran afoul of the rules cited in Plaintiff's motion, MONY suggested a three hour deposition of

4  Dr. Harris paid for by MONY. A deposition is an insufficient alternative and will not remedy the

5  substantial continuing effect on future judicial proceedings in this action. MONY's counsel and its

6  expert should be disqualified and appropriate monetary sanctions be awarded.

V.

## CONCLUSION

9      The legal profession has legal and ethical standards that do not tolerate the type of

10  misconduct in which MONY's counsel engaged. MONY and its counsel gambled with the

11  possibility of incurring this Court's wrath. So far, their gamble has paid off. For all the reasons set

12  forth above, Plaintiff moves this Court to take such action on these objections and the order of the

13  Magistrate Judge of April 16, 2004, and disqualify MONY's counsel and Dr. Harris from further

14  involvement in this case. Appropriate monetary sanctions of at least $30,000 should be ordered.

CADENA CHURCHILL, LLP
GORDON CHURCHILL
RAUL CADENA

DATED: April 28, 2004

By
Raul Cadena
Attorneys for Plaintiff and Counter-Defendant
Roger T. Crenshaw

---

[4] Like the attorney in <u>Rico</u>, MONY's counsel faced a fork in the ethical road.
The right fork required immediate notification to opposing counsel of the illegal and
unethical conduct. The left fork led to this motion to disqualify.



U.S. District Court
Southern District of California
880 Front Street, Room 4290
San Diego, CA 92101-8900

FAX-IN-TIME    NOTICE:
This fax is an official communication of the
U.S. District Court for the Southern District
of California. Please be aware that these are
the only copies of these documents that you
will receive unless specifically requested.

---

To: Kristen Churchill                           Date 04/21/04

From: Clerk U.S. District Court                 Page 1 of 2

---

Fax queued: 04/21/04 at 08:47:39                CASE: 022108-CV #00182

CONFIDENTAL
Any questions about missing pages or unreadable copy, please call (619)
557-7667. The information contained in this facsimile message is attorney
privileged and confidential. It is intended only for the use of the
individual or entity named above. If the reader of this message is not the
intended recipient, or the employee or agent responsible to deliver it to
the intended recipient, you are hereby notified that any dissemination,
distribution or copying is strictly prohibited. If you have received this
communication in error, please call us immediately. Thank you.

IMAGES OF CASE FILINGS NOW AVAILABLE ON THE INTERNET!

Web PACER provides users with browser access to dockets and scanned images
of filed documents without leaving the comfort of their office/home.
Document copies can now be obtained more quickly and without making a trip
to the Clerk£s Office.  Users with a PACER account can visit
http://pacer.casd.uscourts.gov/index.php via user i.d. and password for
immediate Web PACER access to the Southern District of CA£s docket and case
filings.  Links to other courts£ Web PACER sites can be found at
http://pacer.psc.uscourts.gov/cgi-bin/links.pl.  An access fee of $.07 per
page viewed will be assessed.  Those interested in establishing a PACER
account can contact the PACER Service Center at (800) 676-6856 or register
on line at www.pacer.psc.uscourts.gov.

Mail & fax related issues, such as incomplete or illegible pages, should be
directed to
(619)557-7667.

**MINUTES OF THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

CRENSHAW v. MONY LIFE                    Case No. 02cv2108 LAB(RBB)

HON. RUBEN B. BROOKS      CT. DEPUTY VICKY LEE      Rptr. Tape 1: 1-3002

Attorneys

Plaintiffs                                Defendants

Gordon Churchill (present)        Todd Sorrell
Raul Cadena (present)             Peter Mason (present)

PROCEEDINGS:  ____ In Chambers   x  In Court  ____ Telephonic

A hearing on Plaintiff's Motion to 1) Disqualify Peter Mason and Todd Sorrell
as Defendant's Attorneys and 2) Disqualify or Strike Jeffrey Harris as
Defendant's Expert Witness was held on April 12, 2004.

The motion is denied conditionally.  A written memorandum decision will
follow.

Defendant shall produce Dr. Harris for deposition by Plaintiff's counsel
within fifteen days of this Order.  Defendant shall be responsible for Dr.
Harris's fees, the cost of a court reporter, and Plaintiff's counsel fees for
the deposition.  The deposition shall not exceed three hours absent good
cause and a further order of the Court.

Additionally, Plaintiff's ex parte request for a supplemental hearing,
submitted on April 14, 2004, is denied.

DATE:  April 16, 2004         IT IS SO ORDERED: _____
                                               Ruben B. Brooks,
                                               U.S. Magistrate Judge
cc:  Judge Burns                               INITIALS:  VL (mq/dl)  Deputy
     All Parties of Record

K:\COMMON\BROOKS\CASES\CRENSHAW\MINUTE20.wpd

ORIGINAL

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3
   ROGER CRENSHAW,              )  Case No. 02CV2108-LAB(RBB)
4                               )
              Plaintiff,        )  San Diego, California
5                               )
   vs.                          )  Monday,
6                               )  April 12, 2004
                                )
7  MONY LIFE INSURANCE,         )
                                )
8            Defendant.         )
                                )
9  ─────────────────────────────)

10           TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE RUBEN B. BROOKS
11            UNITED STATES MAGISTRATE JUDGE

12

13 APPEARANCES:

14 For the Plaintiff:          GORDON CHURCHILL, ESQ.
                               RAUL CADENA, ESQ.
15                             Cadena Churchill
                               1202 Kettner Boulevard
16                             Suite 4100
                               San Diego, California 92101
17                             (619) 234-3776

18
   For the Defendant:          PETER MASON, ESQ.
19

20 Transcript Ordered by:      KRISTEN CHURCHILL, ESQ.

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcript service.

ii

1  Transcriber:                    Diane Ellison
                                   Echo Reporting, Inc.
2                                  6336 Greenwich Drive, Suite B
                                   San Diego, California  92122
3                                  (858) 453-7590

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1        SAN DIEGO, CALIFORNIA  MONDAY, APRIL 12, 2004

2                        --oOo--

3        (Call to order of the Court.)

4             THE COURT:  Appearances, please.

5             MR. MASON:  Good morning, your Honor.  Peter Mason

6   for Mony Life.

7             THE COURT:  Good morning.

8             MR. CHURCHILL:  Gordon Churchill and Raul Cadena

9   for the Plaintiff, Roger Crenshaw.

10             THE COURT:  Good morning.

11             Counsel, as is my practice, I will give you a

12   tentative ruling.  My tentative ruling is fairly extensive,

13   which should signal to each side that I have spent a lot of

14   time on this motion, and don't need a repetition of items

15   and arguments contained in your papers.

16             I will start with the history of this dispute.

17   Essentially, it began in 1998 when Doctor Crenshaw was

18   complaining of increasingly severe hearing problems.  On

19   September 28th of 1998 he saw Doctor Byrne.  And Doctor

20   Byrne's progress notes have indication that Doctor Crenshaw

21   is to, "See Doctor Harris and return to me," that is, Doctor

22   Byrne.  Doctor Byrne also testified to this effect on page

23   55 of his deposition.

24             There is an outpatient note dated October 22 of

25   1998.  On the upper right hand corner it has the word,

2

1   "Consult."  Under that it states, "Referred by Doctor

2   Byrne."  The bottom of the note is signed by Byrne, B-Y-R-N-

3   E, and also has the signature of Doctor Harris.

4        Doctor Crenshaw filed a disability claim and was

5   receiving payments from Mony, and they began in March of

6   1999.

7        On October 18 of 2002, the Plaintiff was informed

8   that his claim was being denied.  One week later on October

9   25 of 2002, he filed a suit.

10        The parties made their initial disclosures in this

11   case in early 2003.  On March 14, in the Plaintiff's initial

12   disclosures, no mention was made of Doctor Harris as a

13   percipient witness.  In the Plaintiff's supplemental

14   disclosures of March 18, again, no mention was made of

15   Doctor Harris as a percipient witness.

16        The Defendant, however, in its initial disclosures

17   of March 14, did identify Doctor Harris as a percipient

18   witness.

19        In interrogatory answers dated May 10 of 2003, in

20   response to a request to identify health care providers from

21   1990 to the present, Doctor Harris was not identified.

22        Approximately a week later on March -- I'm sorry

23   -- on May 15 of 2003, the parties entered into a stipulative

24   protective order for this case.  And from what I can tell,

25   that is the only protective order that has been entered into

Echo Reporting, Inc.

3

1  this case.  And the order protects confidential information

2  provided by Mony.  It does not appear to address

3  confidential information of the Plaintiff.

4          In August and September of 2003, Alex Medina, an

5  associate at the law firm of Fullbright & Jaworski was asked

6  by primary counsel in this case to locate an expert witness

7  on tendinitis.  That's explained in Mr. Sorrell's

8  declaration.  Mr. Medina apparently found Doctor Harris in

9  September of 2003, and reported that to Mr. Sorrell.

10          On October 2 of 2003, Mr. Sorrell talked to Doctor

11  Harris, and Doctor Harris indicated to Mr. Sorrell that he

12  did not recall treating the Plaintiff, and agreed to act as

13  an expert for Mony.

14          On October 10, Mr. Sorrell met with Doctor Harris

15  in San Diego to discuss the case.  Again, on that date,

16  Doctor Harris confirmed that he did not see the Plaintiff

17  for treatment.

18          Approximately a week later, Mr. Sorrell called

19  Doctor Harris and informed him that his name appeared in a

20  chart note of October, 1998.  And Doctor Harris explained

21  that Doctor Byrne, a resident, was the physician who saw Mr.

22  Crenshaw and wrote the note, but Doctor Harris did sign the

23  note and apparently was supervising Doctor Byrne at that

24  time.

25          Mr. Sorrell received Doctor Harris' expert report

4

1  on or around October 23.

2      On or around November 3 of 2003, Plaintiff's

3  counsel attempted to speak to Doctor Harris, and was unable

4  to do so.  In response to that call, Mr. Sorrell wrote the

5  Plaintiff's counsel, indicating that Doctor Harris would be

6  available for deposition.

7      On November 5, Plaintiffs notice Doctor Harris'

8  deposition for November 19.

9      On November 7, Mr. Sorrell, having learned of the

10  date selected, contacted Doctor Harris, who indicated that

11  he was not available on the date selected.

12      On November 10, Mr. Sorrell wrote the Plaintiff's

13  counsel, saying that Doctor Harris was available on December

14  1, December 8 and December 12.

15      The Plaintiffs then write to defense counsel,

16  asking that Doctor Harris be made available any time between

17  November 18 and November 22.  Defense counsel offers to make

18  Doctor Harris available after the discovery cut off date,

19  which was set at November 24.  This was on November 18.

20      Then over the next couple of days, there's a

21  series of letters going back and forth between counsel,

22  dealing with ethical violations, disqualification and other

23  items.  Ultimately, the Plaintiff filed a motion to

24  disqualify, which is the subject of this hearing, on

25  November 26.

5

1          The first issue is, what is the standard for

2   disqualifying counsel and an expert?  This motion is

3   addressed to the discretion of the Court.  As noted earlier

4   at a prior hearing, disqualification is a drastic remedy and

5   disfavored.  However, courts do recognize that

6   disqualification is an option that should be considered if

7   there is a taint on the judicial process.

8          In an analogous setting, the California Court of

9   Appeals in the Snyder case at 1113 Cal. App. 4, 1187, 1197-

10  1198, Justice Naries notes, in the context of contacting

11  former corporate employees, that a bright line test should

12  be used in deciding whether or not there are guidelines for

13  attorneys to follow before the attorneys are disqualified.

14         In terms of experts, there's a slightly different

15  standard.  Most of the cases that discuss expert

16  disqualification deal with instances where the expert is

17  operating under a conflict of interest, or a switching

18  sides.  For example, an expert may have consulted with one

19  party briefly, been retained or not, and then subsequently

20  is hired by another party.  In that context, most of the

21  expert disqualifications arise.  This is not that type of

22  case.

23         The first ground for disqualifying relates to the

24  Plaintiff's claim that defense counsel has created, or has

25  violated certain ethical guidelines, citing the California

6

1 Bar Legal Ethics opinion in 1975-33, and the San Diego Bar

2 Association opinion 1983-9. Both opinions discuss whether

3 the attorney should contact ex-parte the treating physician

4 of an opponent.

5        Which takes me to the question of whether Doctor

6 Harris is treating the physician. Because he is -- if he is

7 not, then by definition, the two opinions cited by the

8 Plaintiff would not apply.

9        Doctor Harris, apparently, does not think he is

10 the treating physician. In his declaration in paragraph

11 four, I think it's his supplemental declaration, he states,

12 "I am not his" referring to the Plaintiff, "treating

13 physician."

14        The Plaintiff, however, appears to feel

15 differently. In Doctor Crenshaw's declaration in paragraph

16 three, he states, "I had no reason to believe that Doctor

17 Harris was acting as anything other than my treating

18 physician." Doctor Byrne, who agrees that he is the

19 Plaintiff's treating physician, and Plaintiff concedes is --

20 or states is his treating physician in his deposition,

21 described the consultation with Doctor Harris as being in

22 the nature of a second opinion.

23        As I mentioned earlier, the chart note for October

24 22, 1998 refers to the meeting as a "Consult." It also

25 indicates that it was signed by Doctor Byrne, and co-signed

7

1  by Doctor Harris.

2         In considering whether Doctor Harris is the
3  treating physician, cases in the context of Social Security
4  claims frequently deal with this issue.  Social Security
5  regulation 20 CFR, 404 1502, defines a treating physician
6  as, "A physician who provides a patient with medical
7  treatment or evaluation, and who has or has had an ongoing
8  treatment relationship."  In this case, there is no ongoing
9  treatment relationship between Doctor Harris and the
10 Plaintiff.

11        Besides the Social Security cases, there are other
12 cases that distinguish between a treating physician, and
13 someone who provides a consult or a one time examination of
14 a person.  The Lamaroux case, I believe, cited by the
15 Defendants is one of them.  And there is also the McSwain
16 case, which is an early Social Security case out of the 11th
17 Circuit.

18        However, the Ninth Circuit has acknowledged that,
19 even in the case where there is one visit between a claimant
20 and a physician, the physician may be a treating physician
21 if there is ongoing care, and if the physician was still
22 employed by the patient to provide care.  This does not
23 appear to be the case here.

24        Finally, I will note that in the Taurus case,
25 which I discussed at our last hearing, the Court of Appeals

8

1 noted that in the proceedings before the Superior Court, the
2 petitioner had unsuccessfully argued that the minor, Torres,
3 was claiming that Doctor Goodman was the treating physician.

4 The Court of Appeals in Torres found that Doctor
5 Goodman could be retained as an expert for the defense --
6 apparently was not concerned by Doctor Goodman's
7 relationship to Mr. Torres, although I will note that Doctor
8 Goodman did not meet with Mr. Torres, and had only examined
9 a report and had only examined a study of Mr. Torres'
10 unissued report, based upon that.

11 However, in light of all the evidence before me
12 and the guidelines that I have found so far, I conclude that
13 Doctor Harris is not a treating physician for purposes of
14 this motion. Consequently, there is no ethical violation.

15 Next, we turn to whether there is a violation
16 under state law. In this case, I think Torres establishes
17 that contacts between a physician and defense counsel are
18 appropriate if no attorney -- I'm sorry -- no physician-
19 patient conference -- confidences are disclosed.

20 By filing suit, Doctor Crenshaw has waived his
21 privilege, as far as the subject matter of this suit. It's
22 fairly clear from the chart note that Doctor Crenshaw's
23 complications with Doctor Harris only related to tendinitis,
24 which is the subject matter of this suit.

25 So it does not appear, from all the evidence

9

1 before the Court, that there has been any violation or any

2 -- I should say prima facia, it does not appear that there

3 has been any violation.  Nevertheless, the procedure

4 outlined in Torres would seem to be an appropriate

5 safeguard.

6          However, the next issue is whether there is a

7 HIPAA violation.  The Health Insurance Portability and

8 Accountability Act was passed in 1996.  Regulations went

9 into effect in April of 2003.  The regulations relate to the

10 providing of health care information by health care

11 providers, and outlines procedure that is to be followed in

12 providing that information.

13          In at least one case, the Court has concluded that

14 informal discovery, which may have been available pre-HIPAA,

15 is now prohibited unless the patient consents.  That case is

16 Rosalyn Law at 2004 U.S. District LEXIS 3755.  The case was

17 decided February 27, 2004.  It's from the District of

18 Maryland.  And there, the Court noted that patient

19 information can be disclosed in response to a court order,

20 in response to a subpoena, or a discovery request when

21 accompanied by satisfactory assurance that either the

22 patient has been given an opportunity to object, or a

23 protective order is in place.

24          In this case, the facts do not indicate that

25 Doctor Crenshaw had an opportunity to object to any contacts

10

1 between Plaintiff's counsel and Doctor Harris, nor does the

2 protective order that I mentioned earlier appear to apply to

3 Doctor Crenshaw's medical information.

4          MR. MASON:  Excuse me, your Honor.  You said,

5 "Plaintiff's counsel and Doctor Harris."  You meant defense

6 counsel on that?

7          THE COURT:  Yes.  Well --

8          MR. MASON:  In your last sentence.  It sounded

9 like you misspoke, but I just wanted to make sure the record

10 was clear.  That you said what you meant to say.

11          THE COURT:  What I'm saying is that it did not

12 appear that notice was given to the Plaintiff or his counsel

13 in advance of defense counsel's contact with Doctor Harris.

14 Or that a protective order was in place, limiting the use

15 and dissemination of Doctor Crenshaw's medical information.

16 So as a result, it does appear that the provisions of HIPAA

17 have been violated.

18          Next, the question is, what is the appropriate

19 remedy for a HIPAA violation?  In the Rosalyn Law case which

20 I've cited, the Court noted that, under the statute, the

21 violation would only permit the secretary to seek a fine of

22 $100 per violation.  The Court describes the penalty that

23 could be levied by the secretary as mild.

24          In other context, I've come across a case from the

25 Eighth Circuit where, under state law, ex-parte contacts

11

1 between counsel and the treating physician -- or a non-party

2 treating physician, I should say -- was inappropriate under

3 Arkansas law. In that case, the district court imposed a

4 fine of $2,500 per each of two ex-parte contacts.

5        So it appears to the Court that this would be an

6 appropriate guideline for a sanction for a couple of

7 reasons. One, the HIPAA statute and regulations are

8 relatively new -- went into effect in April of 2003. The

9 violation appears to be a technical one. It appears to be

10 the result of inadvertence, as opposed to an intentional

11 violation.

12        For all these reasons, the appropriate sanction

13 seems to be to permit Plaintiff to depose Doctor Harris, and

14 the deposition would be one not to exceed three hours. The

15 deposition would be at the expense of the Defendants. So

16 that is, the Plaintiff would be entitled to have the

17 Defendants pay for Doctor Harris' time, meaning court

18 reporter fees associated with taking the deposition, and the

19 fees incurred by Plaintiff's counsel in taking the

20 deposition.

21        If I recall, I think I saw somewhere in the papers

22 that Doctor Harris charges approximately $600 an hour for

23 his time. And I think I recall that Mr. Crenshaw's time is

24 billed at $345 an hour, although my memory may be inexact.

25        So the Court's tentative ruling is to grant in

12

1 part, and deny in part the -- actually, it's to deny

2 Plaintiff's motion to disqualify defense counsel and Doctor

3 Harris.  However, to require as a condition of that denial,

4 the Defendant to make Doctor Harris available for deposition

5 under the terms outlined.

6         That is the definitive ruling.

7         Again, I'm happy to hear from you, but I hope it

8 is clear from the tentative that you certainly need not

9 repeat anything that is in your papers.

10         MR. CHURCHILL:  Starting with the most recent

11 first, the Court's observation this is done through

12 inadvertence.  If someone inadvertently does something then,

13 as in the case of Recho versus Mitsubishi where documents

14 accidentally got into the hands of the opposing counsel, the

15 first thing the opposing counsel does is notify the other

16 side.

17         Now, Mr. Sorrell's declaration, which is quite

18 incomplete on several fronts, but I won't get into it, says

19 that he knew as of October 16th that -- of 2003 -- that this

20 was a treating doctor, and at least a doctor-patient

21 relationship existed between the parties.

22         Now, the duty upon a lawyer that still is a

23 professional -- the duty on a lawyer when that happens is to

24 say, "I made a mistake," or, "I've committed an inadvertent

25 error."  "I didn't realize that HIPAA applied."  But, they

13

1 have fought tooth and nail from October 16th, through

2 hundreds and hundreds of pages, to say they had done no

3 wrong.

4        That is not inadvertence.  Inadvertence is when

5 someone makes a mistake and says, "Your Honor, I made a

6 mistake.  I'm sorry.  We're going to withdraw Harris.  We

7 shouldn't have done it."  No.  They just hammer away and

8 say, "It's right, it's proper, it wasn't a violation of

9 HIPAA."  It most certainly was, as the Court has observed,

10 because Mr. Sorrell's declaration confesses in no uncertain

11 terms that he violated HIPAA.

12        Now, he has made that confession after he has -- I

13 use this word very, very carefully after considerable

14 thought -- after he has poisoned the mind of this physician

15 with lies, innuendos and untrue statements -- this physician

16 formerly -- Doctor Harris -- who formerly thought Doctor

17 Crenshaw was disabled, has now been led to believe by secret

18 conversations with opposing counsel that perhaps Doctor

19 Crenshaw -- well, I have serious doubts -- he still doesn't

20 say, "I think he can return to work.  I think he can

21 ethically do psychiatric care for his patients.  He can

22 competently do psychiatric care."  We still don't have

23 anybody saying that for the defense.

24        So there is no inadvertence here.  I think that's

25 the wrong word do use.  I think it is a deliberate,

14

1 nefarious scheme to create an issue, medical issue, where

2 none exists.  Because 100 percent of the doctors that have

3 examined Doctor Crenshaw have said he can no longer do his

4 regular occupation, which is the way the policy reads.

5        The big picture here, your Honor, is we get caught

6 up in the legal issues.  But the big issue in this case is,

7 has a desperate Defendant done illegal, immoral and

8 unethical things to try and defeat this case, when their own

9 doctor and all of the doctors that have examined him and

10 checked his hearing have concluded that he can't do his

11 work?

12        And now we have Doctor Harris, who's mind has been

13 changed.  And let's keep in mind the standard, that

14 misconduct is likely to have a substantial continuing effect

15 on further judicial proceedings.  How can Doctor Harris take

16 the stand and erase his mind from the things that Mr.

17 Sorrell said to him, without us present, and without us

18 being able to correct those incorrect statements which he

19 has relied on exclusively to sink his own patient's ship?

20 Or at least, try to help Mony Life Insurance Company to sink

21 the Plaintiff's ship.

22        Doctor Harris ignored a subpoena.  What are the

23 sanctions for that?  Well, if you ignore a subpoena, you

24 don't get to testify.  They ignored it.  And we cut it down

25 to 30 minutes any time of the day or night.  And where is

15

1 the declaration from either counsel or Doctor Harris saying,

2 "I had the following things that were so busy that I

3 couldn't take 30 minutes out of my lunch hour"?

4          THE COURT:  I'm glad you brought that up, because

5 I neglected to mention that in my tentative.

6          It struck me that both parties are at fault there,

7 because what should have happened is, they should have

8 sought Court intervention for either extending the discovery

9 cut off, which would have alleviated a large portion of this

10 dispute, or ordering Doctor Harris to participate.  In any

11 event, neither side did that, and I found both sides equally

12 at fault.

13          MR. CHURCHILL:  Well, I don't think it's the

14 Plaintiff's responsibility to produce an expert.  It is the

15 Defendant's responsibility to produce an expert.

16          THE COURT:  Motions to compel are filed all the

17 time.

18          MR. CHURCHILL:  Your Honor, the time had gone by.

19 I think it's up to the defense to extend -- seek an

20 extension of discovery if it's necessary.  But what we

21 really need to get to the truth of the matter, rather than

22 the posturing is, was Doctor Harris without 30 minutes?

23 Does this Court believe that any human being, whether he's

24 practicing law, practicing medicine, in reviewing future

25 residents -- was one of his excuses -- that he couldn't take

16

1  out 30 minutes from the beginning of the day, the middle of

2  the day, or the end of the day, or a Saturday morning?  No.

3          THE COURT:  Mr. Churchill, I don't believe that

4  this is a 30 minute deposition, which is why I've already

5  given you three hours.

6          MR. CHURCHILL:  That's all I needed to find out

7  what happened, because I didn't have Mr. Sorrell's

8  declaration.  I had no idea what happened.  We were

9  stumbling around in the dark because we don't know.  We've

10  subpoenaed Doctor Harris' records into court today.  I don't

11  know if they've arrived or not, but we still don't even know

12  what his records show.  Is there any --

13          THE COURT:  I've received nothing.

14          MR. CHURCHILL:  There's another ignored subpoena.

15  We've subpoenaed the custodian of records for Doctor Harris

16  to bring in his records today for this hearing, and they

17  choose not to do so.  And I ask counsel, when he stands up

18  here, whether he had anything to do with that apparent

19  decision to ignore a valid subpoena to bring those records

20  in today.

21          As to Doctor Slattery, we were somewhat late in

22  coming to the conclusion that he should be excluded, as

23  well.  And I assume, from the Court's ruling, that since it

24  wasn't in our original motion to exclude Slattery as well,

25  that you haven't ruled on that for all time.  That that

17

1  could be the subject of a separate proceeding at time of

2  trial before Judge Burns.

3          THE COURT:  I haven't ruled on it.  That's

4  correct.

5          MR. CHURCHILL:  So, back to my point on the

6  substantial continuing effect on judicial proceedings, how

7  can the Court say to Doctor Crenshaw that this conduct by

8  Defendant counsel -- Defendant and Defendant counsel and

9  Doctor Harris will not have -- is not likely to have -- it

10 doesn't have to be absolute -- likely to have a substantial

11 continuing effect on this case?

12         How can Doctor Harris, and by extension, Doctor

13 Flattery, take the stand and be fair to Doctor Crenshaw,

14 when they've just been fed one side of an issue?  And these

15 scandalous matters that were used to poison the doctor's

16 mind, whether they're truthful or not truthful, it doesn't

17 really matter for the subject of whether it's proper for

18 them to do so.  It most certainly isn't.

19         I've always been of the opinion that when a wrong

20 occurs, the remedy should match the wrong.  And a $2,500

21 fine or forcing them to pay for a litigation which -- I

22 mean, excuse me -- a deposition which would approximate this

23 single amount of money -- considering what they've put

24 Doctor Crenshaw through in the way of expense over this

25 issue, is totally inadequate.

18

1        Lastly, on the treating physician, the Social

2   Security cases make that distinction because in Social

3   Security cases, they give -- at least, try to give in most

4   cases greater credibility to someone that has an ongoing

5   relationship.  That is not the issue here.

6        The issue here is whether there was ever a doctor-

7   patient relationship.  In Doctor Crenshaw's declaration he

8   said, "I confided in him.  I assumed that he was my doctor.

9   I assumed I could speak freely about my problems.  And I

10  considered him to be my physician."  At that moment, a

11  doctor-patient relationship exists.

12        He, Harris, is a provider of health that is

13  covered by HIPAA.  There's no doubt about that.  The defense

14  has not even tried to say that he's not covered by HIPAA.

15  HIPAA doesn't say "Treating doctor."  HIPAA doesn't say

16  "Consulting doctor."  HIPAA says, "A provider of health care

17  may not disclose, even in the context of litigation, without

18  giving notice to the patient."

19        Now, that is not a hard rule to follow, your

20  Honor.  That is about as simple a rule as Congress has ever

21  enacted.  You have to let the other side know what you're

22  doing.  We have all these cases and, as one of the cases

23  cited by Defendant, the Stewart case, these cases are

24  irreconcilable as to whether you can or can't sneak in the

25  back door of a doctor's office and talk to him.

19

1           Congress fixed that.  Just like they fixed it with
2  ERISA.  And they fix these multiple different jurisdictions
3  coming up with multiple different answers.  They fixed it
4  with a nationwide standard.  Here it is, folks.  You had
5  five years from the time it was passed until the time the
6  final rules were adopted.  We're not sneaking up on you.
7  You must give notice to the patient.  Let him know what is
8  going on.  They didn't do it, your Honor.  They didn't do
9  it, and they knew they didn't do it, and they knew they were
10 supposed to do it.

11          Mr. Mason won't get up here and say, "We were
12 ignorant of HIPAA."  He won't take the stand and say it
13 under oath, either.  Nor will he provide any witness.  Nor
14 has he provided any declaration for this Court that, "We
15 were ignorant of HIPAA," and, "It was all a big mistake,"
16 and, "It was all inadvertence."  He said, "We have the right
17 to do it.  We did it because it was okay to do it.  It was
18 ethical, it was legal, and it was proper."  It was none of
19 the above.

20          Excuse me for losing my temper, your Honor, but I
21 get a little angry when I see a member of the bar
22 deliberately violating the law and getting away with it.
23 It's wrong.  It's immoral.  It's unethical.  It's
24 unprofessional.  And this is still a profession.  This isn't
25 a case where we can do whatever we can get away with, and

20

1 have to pay for a court reporter for three hours.

2          That's a -- that's no solution at all, your Honor.

3 That's just no solution at all.  Congress didn't enact that

4 law to cause someone to pay for a deposition.  They enacted

5 that law to stop the flow of unauthorized medical

6 information.  And that's what HIPAA is all about, and that's

7 what happened in this case, an unauthorized flow.  They

8 didn't give notice, and by failure to give notice, they lose

9 the right to use that doctrine.

10          The rules of professional conduct include the one

11 we've cited, "Shall not advise a violation of any law, rule

12 or ruling of a tribunal."  And they advised them to go ahead

13 and talk to them; that it was okay to do so.  When a lawyer

14 advises someone to violate the law, that is way beyond

15 inadvertence.  That is reprehensible conduct, and this Court

16 should not condone it, and this Court should put a stop to

17 it.  And this Court should say, in a published decision,

18 that this may not happen.

19          Because if the Court's tentative is the ruling --

20 the final ruling of the Court, "Katie, bar the door,"

21 because everybody is going to be doing it.  What's the worst

22 thing that will happen?  "Well, I poisoned this doctor, and

23 I poisoned that witness.  And I poisoned that one, and I

24 tainted them all.  And who cares?  I get to let them

25 testify, anyway."  What kind of a system of justice is that?

21

1 That is no system at all.

2          These men are tainted.  They're poisoned.  Their

3 minds have been changed.  And there is no way to unring that

4 bell.  Doctor Harris cannot take a witness stand in this

5 trial and say anything but, "I saw him in October of '98,

6 and I thought he was disabled," without plugging in the

7 stuff that they asked him to plug in, improperly, unfairly,

8 and untruthfully.

9          Thank you.

10          MR. MASON:  Your Honor, I will not argue on the

11 sanctions, except the order of the Court.

12          I would like to just -- because of my own standing

13 and the high regard I have for this Court, I want to offer

14 some comments about our conduct.  There has been a real

15 personal attack here, which I think is unnecessary and not

16 called for.  Let me address three issues.

17          HIPAA.  We've all gotten an education about HIPAA,

18 and regulations that were passed less than a year ago.  As I

19 understand those regulations, they apply to when someone is

20 seeking health information from a doctor.  We didn't seek

21 any information from Doctor Harris.  We didn't know that

22 Doctor Harris had any information.  And when we asked Doctor

23 Harris if he had ever treated Doctor Crenshaw, he didn't

24 recall treating Doctor Crenshaw.

25          So we didn't seek out any information that would,

22

1  in my view, perhaps put us under the auspices of the HIPAA

2  regs.  But I understand the Court's ruling on that.  We'll

3  learn and do it better and differently the next time around.

4  But I want the Court and opposing counsel to know that there

5  was no effort to violate HIPAA, because we never contacted

6  him for the purposes of getting information about Doctor

7  Crenshaw.

8         To the contrary, we contacted him to serve as an

9  expert witness, not knowing that he was considered a

10 treating physician by Doctor Crenshaw.  In fact, Doctor

11 Crenshaw, in his early disclosures, did not identify him as

12 a treating physician, nor in the interrogatories.

13        Secondly, this whole thing about the poisoning and

14 the misconduct.  It's anomalous to me that that is the

15 thrust of the moving party's argument.  I thought the

16 problem was -- is that Doctor Harris would be giving us

17 information that somehow would taint these proceedings.  And

18 that's why we were all concerned about HIPAA and so-called

19 ethical violations.  The Plaintiff has turned that on its

20 head.

21        They say that the problem is not what Doctor

22 Harris told us, but what we told Doctor Harris.  Well,

23 that's not subject to any ethical restriction, nor is it

24 subject to any other violation of law.  But if Plaintiff

25 really believes that to be true, then there is a wonderful

23

1 process. It's called cross examination where, at the time

2 of trial, he should be able to show that we have poisoned

3 his mind.

4         That we have been given lies and half truths -- I

5 mean, things that I just -- in 27 years I've never heard

6 people accuse me of doing before. But nevertheless, that's

7 what a trial is for, and that's what cross examination is

8 for.

9         Third point, on the deposition of Doctor Harris.

10 You're right. We should have come to the Court. In my 27

11 years, again, when someone is seeking discovery from me, and

12 the discovery deadline has -- is about to run, and they want

13 to take it over -- they want to get the discovery done. And

14 I agree, "Fine, we'll make him available after the discovery

15 cut off."

16         And in this case, it was going to be four or five

17 days, and there was a Thanksgiving holiday in between, that

18 we'd make him available on December 1. I honestly felt, and

19 I think now, inappropriately, but I honestly felt that

20 that's not something that I had to involve the Court with.

21 We were willing to stipulate. Hindsight, that may have been

22 wrong, but that was what we were trying to do.

23         Other than that, your Honor, we stand by the

24 tentative as submitted.

25         THE COURT: Mr. Mason, I do have a question for

24

1 you.

2          MR. MASON:  Sure.

3          THE COURT:  I just want to make sure that my

4 understanding of the facts is correct.  Am I correct that

5 there is only the one protective order in this case, that I

6 described?

7          MS. MASON:  I'm virtually certain that's correct.

8          THE COURT:  Mr. Churchill, anything further?

9          MR. CHURCHILL:  Just on that subject of a

10 protective order, your Honor.  We can't seek a protective

11 order unless we know what's going on.  That's what HIPAA's

12 for, is to give us notice so that we can seek protective

13 order.  HIPAA actually says, "Give notice, and give an

14 opportunity to seek a protective order," so that this

15 nefarious conduct can't happen.

16          We didn't get notice.  We had no opportunity to

17 seek a protective order, because we had no idea what they

18 were up to.  And when the time came to disclose these

19 experts they said, "We don't know who they are.  We're not

20 going to identify them.  And we're not going to give you

21 their reports."

22          To say that a secretary on Thursday mis-dated

23 something back to Monday -- I won't comment further on that,

24 but he had before in his hand any and all rights to it.  But

25 it doesn't matter.  He knew who they were.  He could have

25

1 identified them, and allowed us to intercede with this
2 scheme that was going on.  We never had the opportunity, and
3 the lack of a protective order was caused by their conduct.
4 We had no way of knowing what it would be.

5           We're faced with a situation that needed a
6 protective order, because in my 35 years -- I've got just a
7 few more years than Mr. Mason -- I have never ever had a
8 defense attorney do this.  Any my practice has been almost
9 exclusively in this insurance litigation business, and I've
10 never had anybody do it.  And it didn't even dawn that that
11 would be a possibility, that they would violate the state
12 bar ethics and county bar ethics and HIPAA.

13          I can't read the mind of someone that's going to
14 go out do what I call immoral and unethical things.  That's
15 not my job.  My job is to represent my client as best I can,
16 under the circumstances.  I can't do that if they're
17 sneaking in the back door and talking to my witness.  And
18 when Mr. Mason says, "Hey, we didn't ask him anything.  We
19 just told him some things."  How do we know that?  We'll
20 never know that.  Mr. Sorrell didn't give us any declaration
21 on that.

22          If there's any depositions in the future, they
23 ought to include Mr. Medina, to see if that's truthful or
24 not -- Mr. Sorrell -- to see really what went on between his
25 thinking and what went on in this case.  And Harris should

26

1  be out of the case forever and ever.  Otherwise, my client's

2  right to a fair day in court is gone forever.  And I cry at

3  the thought of that happening, because it just isn't right.

4          THE COURT:  All right.  I'm going to take this

5  under submission, and I can tell you what to expect.  You

6  will either -- well, you will receive a minute order and the

7  minute order will tell you whether to expect a -- well,

8  you'll receive a minute order telling you what to expect, or

9  a definitive ruling.  But currently, I'm taking this under

10 submission.

11          MR. MASON:  Thank you, your Honor.

12          THE COURT:  You're welcome.

13          The court's in recess.

14      (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

27

1          I certify that the foregoing is a correct

2  transcript from the electronic sound recording of the

3  proceedings in the above-entitled matter.

4

5  _Diane Ellison_      _4/28/04_
   Transcriber              Date

6

7  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8  _L. L. Francisco_

9  L. L. Francisco, President
   Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## PROOF OF SERVICE BY MAIL

Raul Cadena certifies and declares as follows:

I am over the age of 18 years, and not a party to this action.  My business address is 1202 Kettner, Suite 4100, San Diego, CA 92101, which is located in the county where the mailing described below took place.

On April 29, 2004, I deposited via U.S. Mail at San Diego, California, a copy of **OBJECTIONS OF PLAINTIFF TO DISCOVERY ORDER OF MAGISTRATE JUDGE** attached in a sealed envelope, with postage fully prepaid, addressed to:

Todd Sorrell, Esq.
Fulbright & Jaworski
865 South Figueroa Street, 29th Floor
Los Angeles, California 90017
ATTORNEYS FOR MONY

I certify and declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 29, 2004

RAUL CADENA